

**SIGNED this 13th day of November, 2019**

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

---

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE

In re:

      No.  1:13-bk-16079-SDR
      Chapter 7

HC LIQUIDATION, INC.,
      Debtor,

HARDWICK CLOTHES, INC.,
      Plaintiff,

v.

      Adversary Proceeding
      No.  1:18-ap-1005-SDR

RICHARD P. JAHN, JR., TRUSTEE,
      Defendant.

# MEMORANDUM OPINION

## I.    Summary

On January 18, 2018, Hardwick Clothes, Inc. ("Plaintiff") filed a complaint in this adversary proceeding against Richard P. Jahn, Jr., chapter 7 trustee of the Debtor's bankruptcy estate ("Trustee" or "Defendant"). [Doc. No. 1].[1] The complaint was amended on November 9,

---

[1] All docket entry reference numbers refer to docket entries for Adversary Proceeding No. 1:18-ap-1005-SDR, unless otherwise noted.

2018. [Doc. No. 44]. The controversy between the parties stems from an asset purchase agreement ("APA") and bill of sale (together the "agreement") entered into between the Plaintiff's predecessor in interest, Jones CapitalCorp, LLC, as the buyer and the Debtor, HC Liquidation, Inc. f/k/a Hardwick Clothes, Inc. ("Debtor") as the seller. [*Id.* at 1-2, 5-6]. This court approved the sale on June 6, 2014. [*Id.* at 2]. The Trustee took over the Debtor's estate approximately five months after the sale closed.

The central dispute in this case is over which party owns and has the right to proceeds from a certificate of deposit at First Tennessee Bank ("CD"), which had a balance at the time of the sale of $325,000.[2] The Plaintiff seeks a declaratory judgment that it purchased the CD from the Debtor under the terms of the agreement and requests that the court order the Trustee to return the CD, or its value, to the Plaintiff. The Trustee contends that the CD was not conveyed by the terms of the agreement and remains in the Debtor's bankruptcy estate for distribution to creditors. In support of this position, the Trustee argues that, after the sale, the parties to the transaction did not act as though the CD had been sold. The Trustee also raises the equitable defenses of laches, failure of consideration, and equitable estoppel. In support of these defenses, the Trustee primarily argues that post-sale representations made by an officer of the Plaintiff were misrepresentations on which he relied when asserting control over the CD and which resulted in damage to the estate. The Trustee also argues that the Plaintiff improperly delayed asserting its interest in the CD and is unable to show that it paid consideration for the CD.

The court held a trial on June 4-5, 2019.  Based upon the testimony of the witnesses, the exhibits admitted, and the arguments of counsel, the court makes the following findings of fact

---

2 In its amended complaint, the Plaintiff identified $334,539.56 in "disputed property," that it alleged it purchased from the Debtor, yet over which the Trustee improperly exercised control. [Doc. No. 44, at ¶¶ 14-15]. At trial, the Plaintiff indicated that it was only seeking recovery of the proceeds of the CD.

and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

For the reasons stated below, the court finds that the Debtor and the Plaintiff intended to convey the CD under the terms of the agreement. However, post-sale actions taken by the Plaintiff and its employees prevent the Plaintiff from entitlement to the full amount of the CD at the time of conveyance. Based on the doctrine of equitable estoppel, the Plaintiff's recovery will be reduced by the amount of proceeds, $101,300, that the Trustee obtained in reductions from the CD and relied on in making an interim distribution to creditors before the Plaintiff asserted an interest in the CD on September 21, 2017. The court will order the Trustee to return the remaining CD in its reduced amount and in its current form to the Plaintiff along with $75,000 representing funds that he obtained from the CD but has not yet distributed to creditors, less the costs of obtaining the $75,000 and administering and attempting to liquidate the remaining certificate of deposit.

## II.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district, provide this court with jurisdiction to hear and decide this adversary proceeding.  The parties agree that the Plaintiff's action is a core proceeding and have also consented to this court's entry of judgment. [Doc. No. 44, at ¶¶ 1-2; Doc. No. 52, at ¶¶ 1-2]; s*ee* 28 U.S.C. §§ 157(b)(2)(A),(O).

## III.    Facts

*a.  Witnesses*

At trial, the court heard testimony from the following witnesses:[3]

    i. Thomas Hopper, the Debtor's President.[4]

    ii. William Aiken, the Debtor's corporate counsel.

---

3 All testimony was presented on June 4, 2019. All citations to testimony refer to the recording of the proceeding on that date.
4 Mr. Hopper's testimony was provided by deposition due to his unavailability for trial. [Tr. Ex. 41].

iii. W. Allan Jones, Jr., the owner and sole member of Jones CapitalCorp, LLC.

iv. Joe Mason, Senior Vice President / CFO of Jones CapitalCorp, LLC.

 v. Robert Belcher, a CPA who performed auditing and financial statement review for

   both the Debtor before the sale and the Plaintiff after the sale.

vi. Carmin Chastain, a former accounting manager and Treasurer for the Debtor who

   later became an accounting officer and CFO of the Plaintiff.

vii. Richard P. Jahn, the Trustee of the Debtor's bankruptcy estate.

*b. Debtor's Business and Filing*

The Debtor manufactured men's custom suits and uniforms for over one hundred years. The Debtor was a major employer in Cleveland, Tennessee, where it operated for the duration of its existence. The Debtor filed bankruptcy on December 2, 2013, when it was faced with the prospect of the Pension Benefit Guaranty Corporation ("PBGC") closing the company due to its failure to fund its pension plan. [Tr. Ex. 41, at 5-6]. The Debtor's management viewed the best alternative to liquidation by the PBGC to be the sale of the company as an ongoing concern. [*Id.* at 6]. Mr. Jones testified that he was interested in purchasing the assets of the Debtor in order to "save the company" and "[a]ll the jobs" that went with it. [Testimony of Allan Jones, at 3:29:55].

*c. The Sale Motion and Order*

On March 19, 2014, the Debtor filed a motion for authorization to sell "substantially all" of its assets to Jones CapitalCorp, LLC, the Plaintiff's predecessor in interest ("Sale Motion"). [Tr. Ex. 1]. By filing this Sale Motion, the Debtor sought to have the court approve the APA by which it sold its assets to the Plaintiff. In an order approving the sale entered on June 6, 2014 ("Sale Order"), the court authorized the Debtor "to convey the assets of Debtor, all of which are more fully described in the Asset Purchase Agreement filed with the Sale Motion." [Tr. Ex. 5, at

¶ 4]. In the paragraphs of the Sale Order that followed, the word "Assets" was capitalized but not

defined. In paragraph 25 of the Sale Order, the court authorized the Debtor:

> to transfer the Assets of Debtor in accordance with the terms of the Asset Purchase
> Agreement. The Assets of Debtor shall be transferred to Jones CapitalCorp, LLC,
> and upon consummation of the Asset Purchase Agreement, such transfer shall (a)
> be valid, legal, binding and effective; (b) vest Jones CapitalCorp, LLC with all
> right, title and interest of the Debtor in the Assets of Debtor; and (c) be free and
> clear of all Claims, with all Claims that represent interest in property to attach to
> the net proceeds of the Sale Transaction, in the order of their priority and with the
> same validity, force and effect which they now have against the Assets of Debtor,
> subject to any claims and defenses the Debtor may possess with respect thereto.
> Jones CapitalCorp may designate one or more assignees to take title to any or all
> assets at the time of closing without further order of the Court.

[*Id.* at ¶ 25].

> d.   *The Asset Purchase Agreement*

The APA set forth the substance of the parties' agreement, including which assets were to

be sold. The APA defined the term "Assets" in Paragraph 1.02(b), as follows:

> **"Assets"** shall mean, collectively, all of the Debtor's assets of any nature
> whatsoever, real, personal or mixed, known or unknown including, but not limited
> to the fee interest in the Land and Improvements, Accounts Receivable, Equipment,
> Inventory, Supplies, Intellectual Property, all of Seller's memorabilia, historical
> artifacts, historic samples, historic clothing, archives, relics, keepsakes, souvenirs,
> pictures, books, accounting records, newspaper articles, Intangible Personal
> Property, Records, Assumed Contracts, pre-paid assets, refunds, unclaimed funds,
> customer and other deposits, including utility deposits, and other intangible and
> tangible assets, whether real, personal, or mixed, which are located upon the Land
> or owned and held for the use by Seller in connection with the Business but
> excluding the Excluded Assets in all cases.

[Tr. Ex. 2, at ¶ 1.02(b)].

 Section 2.01 of the APA set forth the assets to be sold:

> **Agreement to Sell and Purchase.** In consideration of the mutual covenants and
> promises contained in this Agreement, and subject to the approval of the
> Bankruptcy Court to be set forth in the Sale Order (as hereinafter defined), Seller
> agrees to sell, assign, transfer, and convey unto Purchaser the Assets, and Purchaser
> agrees to purchase all of Seller's right, title, and interest in and to the Assets, upon
> the terms and conditions set forth herein, *such Assets being more particularly*

5

described on Exhibit 2.01 attached hereto. Subsequent to the Effective Date[5] of this
Agreement until the Closing, Purchaser and Seller may mutually agree to amend,
modify, or supplement such exhibit.

[*Id.* at ¶ 2.01 (emphasis and footnote added)].

Rather than including a list of the assets that were being sold, the version of Exhibit 2.01 attached to the APA filed with the Sale Motion ("March 19 Exhibit 2.01") simply stated that, "[t]he Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date." [*Id.* at 31]. Numerous other exhibits in the APA had the same language rather than final itemized lists. [*Id*. at 32-39].

On April 16, 2014, prior to the hearing on the sale, the Debtor filed a new version of Exhibit 2.01 on the docket. ("April 16 Exhibit 2.01"). [Tr. Ex. 3]. The exhibit did not contain a notice or explanation as to the significance of its contents. The exhibit contained a detailed listing of property grouped by categories. The categories included, *inter alia*, accounts receivable (as of April 9, 2014), equipment, inventory, deposits and prepaid assets (as of February 1, 2014), life insurance policies, and intellectual property. [*Id.*]. Each category listing was followed by a parenthetical indicating that the list was "[s]ubject to revision in the ordinary course of business until 11:59 PM on day before closing." [*Id.*]. The list of items under the category "deposits and prepaid assets" did not contain any reference to the CD but did include three utility deposits. [*Id.* at 26]. A final category was titled "Clothing Pattern and Designs." [*Id.* at 29]. The last sentence on the last page of the April 16 Exhibit 2.01 stated, "Any and all Other Assets of any nature known or unknown, whether or not set forth above not otherwise excluded as set forth on Exhibit 2.05." [*Id.* at 47]. This clause, which the court will hereafter refer to as the "catch-all provision," was in bold text and was located on the same page as the final items in the "Clothing Pattern and Designs"

---

5 The Effective Date was defined as March 18, 2014. [Tr. Ex. 2, at 5].

category. [*Id.*].

At closing on June 16, 2014, a third version of Exhibit 2.01 was attached to the final

agreement without any indication on its face whether it was a replacement or an update ("June 16

Exhibit 2.01"). [Tr. Ex. 6]. The June 16 Exhibit 2.01 contained an itemized list of, *inter alia*,

accounts receivable and inventory, including raw materials, work in process, and finished goods.

[*Id.*]. This exhibit did not contain any qualifying language such as that used in the April 16 Exhibit

2.01 to indicate that the items listed were still subject to revision at a later date. Nor did the June

16 Exhibit 2.01 contain the catch-all provision found in the April 16 version. It also failed to

include any reference to equipment or intellectual property. Mr. Aiken, who participated in

negotiating and drafting the APA on behalf of the Debtor, testified that the June 16 Exhibit 2.01

was intended to "update," rather than replace, the April 16 Exhibit 2.01. [Testimony of William

Aiken, at 10:27:31]. He attributed the mistake to a clerical error. [*Id.* at 10:27:42].

The catch-all provision used the term "Other Assets," which was not defined in the APA.

As noted above, the APA defined "Assets" in Paragraph 1.02(b), but the definition included an

exception requiring consideration of another section of the APA and its corresponding exhibit. [Tr.

Ex. 2, at ¶ 1.02(b) ("'Assets' shall mean . . . all of the Debtor's assets . . .  but excluding the

Excluded Assets in all cases.")].

Excluded Assets were defined as "those items mutually identified and agreed to by the

Parties hereto in writing, if any, as provided in Section 2.05 of this Agreement." [*Id.* at ¶ 1.02(h)].

Section 2.05 of the APA provided as follows:

> **Excluded Assets.** In entering into this Agreement, Purchaser shall not acquire, as
> a result of the Transaction set forth herein, any interest in any of the Excluded
> Assets, such Excluded Assets described more particularly on Exhibit 2.05 to this
> Agreement, including without limitation the rights relating to certain utility
> deposits set forth on Exhibit 2.05, and specifically disclaims any interests
> whatsoever therein. Subsequent to the Effective Date of this Agreement until the

7

Closing, Purchaser and Seller *may* mutually agree to amend, modify, or supplement such exhibit.

[*Id.* at ¶ 2.05 (emphasis added)]. The Exhibit 2.05 attached to the APA and filed with the Sale Motion, contained no items, only the statement that, "[t]he Parties agree to work together, in good faith, to finalize this exhibit as soon as practicable after the Effective Date." [*Id.* at 32]. Despite the fact that "certain utility deposits" were excluded from the sale by Section 2.05, there were no utility deposits listed on Exhibit 2.05. [*Id.*]. As noted above, a number of utility deposits were in fact included on the April 16 Exhibit 2.01, which listed the assets to be sold. [Tr. Ex. 3, at 26].

When the sale closed on June 16, 2014, Exhibit 2.05 was never updated to add any excluded assets. The statement that the parties would work together to finalize the exhibit remained in the APA at closing. Mr. Aiken testified that, to his knowledge, the Excluded Assets exhibit was never completed. [Testimony of William Aiken, at 10:47:43]. Mr. Hopper did not know whether Exhibit 2.05 was ever finalized. [Deposition of Thomas Hopper, Tr. Ex. 41, at 26-27]. Ms. Chastain testified that she never saw the Excluded Assets exhibit. [Testimony of Carmin Chastain, at 3:59:03]. The court finds that Exhibit 2.05 was never finalized in writing. Although certain items were in fact excluded from the sale, such as utility deposits and cash, these items were not reflected on Exhibit 2.05.

*e.  The Bill of Sale*

The APA authorized the Debtor to execute whatever documents were required to consummate the transaction. The Debtor executed a deed to convey the real estate and a bill of sale for personal property on June 16, 2014. [Tr. Ex. 7, at 5]. The bill of sale provides in pertinent part:

Whereas, capitalized terms used but not defined herein have the respective meanings ascribed to them in the Asset Purchase Agreement.

8

> 1. Sale and Assignment of Assets. The Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, and its successors and assigns, and Purchaser hereby purchases, acquires and accepts from Seller, all of Seller's right, title and interest in, to and under the Assets, other than the portion of the Assets that constitute the Intangible Personal Property, the Land and the Improvements, free and clear of all liens (other than those created by Purchaser and attaching upon the consummation of the transfer of the Assets and other than otherwise expressly assumed by Purchaser pursuant to the Asset Purchase Agreement) and Excluded Liabilities.

[*Id.* at ¶ 1].

### f.   History of the CD

At the time of the closing, the CD in question served as security to ensure the payment of workers' compensation claims. [Testimony of Carmin Chastain, at 3:53:28]. The Debtor had self-insured at one point in its history. [*Id.*]. When it changed its practice, the Tennessee Department of Commerce and Insurance required it to post a certificate of deposit in the amount of $500,000. [*Id.*]. Over time, the potential for claims diminished, and the Debtor was able to get reductions in the amount of the CD to $325,000.[6] [*Id.*; Tr. Ex. 13, 19]. The funds from the reduction were used in the Debtor's operations. [Testimony of Carmin Chastain, at 3:57:46]. The CD required periodic renewals with the bank, but it was not scheduled to be released from the claims of the state until 2021. [Tr. Ex. 19].

### g.   Testimony Related to Whether the CD was Intended to be Sold

At trial, the parties to the sale were unanimous in their view that the agreement was intended to convey all of the Debtor's assets, except utility deposits.[7] Mr. Hopper and Mr. Aiken, who negotiated the sale on behalf of the Plaintiff, testified that the sale was intended to be for all

---

6 The record shows that the CD was reduced from $500,000 to $350,000 in 2012 and that a second reduction to $325,000 took place in 2013. [Tr. Ex. 19, at 2].

7 The court notes that witnesses provided inconsistent testimony regarding whether utility deposits were to be included in the sale. However, the court does not ascertain any disagreement between the parties on the fact that the utility deposits were not sold and remained with the Debtor following the sale.

assets. [Deposition of Thomas Hopper, Tr. Ex. 41, at 8, 15; Testimony of William Aiken, at 10:23:42, 10:43:22]. Mr. Jones and Mr. Mason, who negotiated on behalf of the purchaser, also indicated their belief that the parties intended for all assets to be sold. [Testimony of Allan Jones, at 3:31:07; Testimony of Joe Mason, at 2:31:52].

The parties were less clear on whether the sale of the CD itself had been specifically negotiated. Mr. Aiken did not recall having a specific discussion about the CD during sale negotiations. [Testimony of William Aiken, at 10:30:59]. Mr. Mason testified that Mr. Hopper told him that all of the assets were being sold but admitted that the CD was never specifically mentioned. [Testimony of Joe Mason, at 3:01:07]. However, Mr. Jones testified that he was aware of the CD and believed he was buying it, and Mr. Hopper believed it was "part of the assets" included in the sale. [Testimony of Allan Jones, at 3:31:33; Deposition of Thomas Hopper, at 25-26].

Mr. Mason testified that he became aware of the CD prior to the sale closing. [Testimony of Joe Mason, at 2:34:48]. He stated that he reviewed the Debtor's bankruptcy schedules with Ms. Chastain in February or early March 2014. [*Id.* at 2:40:58]. The Debtor had listed the CD as an asset pledged to the State of Tennessee on Schedule B. [Case No. 1:13-bk-16079-SDR, at Doc. No. 37]. Mr. Mason related that he and Ms. Chastain discussed the CD's history and the fact that the CD supported workers' compensation claims. [Testimony of Joe Mason, at 2:35:00, 2:40:51]. Mr. Mason understood that it would take a long time before funds from the CD were released as it was still subject to workers' compensation claims. Mr. Mason thought it was "highly unlikely" that the CD funds could be obtained without "significant delay from the state" and additional workers' compensation claims in the future. [*Id.* at 2:35:10]. For this reason, he believed the CD had little value in the sale. He relayed that he told Ms. Chastain that "this [CD was] going to be a

long-term asset that has a highly uncertain value and most likely would be recorded at zero." [*Id.* at 2:41:15]. He thought she understood that he expected the CD to be an asset of the Plaintiff's after the sale. [*Id.* at 3:01:54-3:02:17]. Mr. Mason testified that he believed Ms. Chastain had been assigned to produce the list of assets to be sold. [*Id.* at 2:58:08]. He testified that he dealt only with Ms. Chastain with regard to the information that was produced on the schedules to the agreement. [*Id.* at 3:00:42].

Mr. Mason participated in substantially all of the negotiating sessions. [*Id.* at 2:26:31]. He testified that he was involved in the discussion to include the catch-all provision. [*Id.* at 2:29:25]. Indeed, he proposed the language used in the catch-all provision found in the April 16 Exhibit 2.01, and believed it was necessary because it was "impossible to determine" if the sale had "covered all the assets that were being acquired because the [Debtor] was in daily operation." [*Id.*]. Mr. Mason testified that, "It was clear to me that [the] list [of assets] was a moving target and would be subject to revision. Therefore, I felt like it was very important to have language that reflected the intent that all assets were being purchased, known, unknown, regardless of where they might be." [*Id.* at 2:30:02].

While still working for the Debtor, Ms. Chastain prepared the list of assets to be sold. [Testimony of Carmin Chastain, at 3:57:42]. She did not include the CD in her drafts of Exhibit 2.01 identifying the assets to be sold. The CD was neither mentioned in the exhibits to be sold nor excluded by name, and the sale closed with the value of the CD locked up until the workers' compensation claims were resolved by the running of the statute of limitations on the claims in 2021.

h.   *Utility Deposits and Cash Accounts*

As the court explained above, there was some confusion in the testimony regarding whether

11

utility deposits were to be left with the Debtor in the sale. [*See supra* n.7]. The APA provided that "certain utility deposits" were to be excluded in the sale; however, no utility deposits were ever put on the Excluded Assets Exhibit 2.05.  [Tr. Ex. 2, at ¶ 2.05]. Puzzlingly, utility deposits were then added to the April 16 Exhibit 2.01 but left off of the June 16 Exhibit 2.01. [Tr. Ex. 3, at 26; Tr. Ex. 6]. Ultimately, the utility deposits were left behind with the Debtor to be applied against the utility's outstanding bill. [Testimony of Carmin Chastain, at 3:59:56]. It appears that there is no actual dispute amongst the parties that the utility deposits were excluded from the sale regardless of what the agreement said.

It appears that there was also some confusion about whether the Debtor's cash was left behind in the sale. Mr. Jones testified that the Debtor "didn't have any cash." [Testimony of Allan Jones, at 3:32:45]. Ms. Chastain testified that the Debtor kept its cash accounts. [Testimony of Carmin Chastain, at 3:59:15]. Indeed, the Trustee testified, and his report of estate cash receipts and disbursements reflects, that $485,795.41 was delivered to him by Ms. Chastain in December 2014. [Testimony of Richard Jahn, at 1:36:14; Tr. Ex. 26, at 1].

These contradictory positions can be reconciled by taking into consideration the existence of the post-petition lender, Keltic Financial ("DIP lender"). Mr. Jones testified that the Plaintiff anticipated that any cash deposits that served as collateral for the loan would be used to reduce the outstanding balance to the DIP lender. [Testimony of Allan Jones, at 3:34:06]. The Sale Order required the Debtor to use the sale proceeds to satisfy the lender's claim. [Tr. Ex. 5, at 17-18]. Mr. Jones agreed that the DIP lender was paid off with proceeds from the sale. [Testimony of Allan Jones, at 3:33:37]. The DIP lender did not apply all the cash on deposit before being paid with the sale proceeds, and this resulted in the Debtor keeping the cash. Whether the funds to satisfy the DIP lender's lien came from operations or sale proceeds did not appear to have been particularly

important to either the Debtor or the Plaintiff. The purchase price and the dollars left for administration of the estate would be the same when the transaction was concluded.

The Sale Order required the Seller to pay any existing tax liens or other similar statutory liens with the sale proceeds. [Tr. Ex. 5, at 17, ¶ 32(A)]. If any senior statutory lien claims were not resolved, then the Debtor agreed to set up a trust account with the sale proceeds to cover the unresolved statutory lien claims that had priority over the claims of the DIP lender. [*Id*]. Then, the Debtor was to pay the claim of the DIP lender, after which, the Debtor was allowed to retain sufficient funds to fund its operations and to pay professional fees. [*Id.* at ¶ 33].

The Debtor never set up any of the reserve accounts contemplated by the Sale Order. Ms. Chastain, in her capacity as the Debtor's last active employee, paid out the administrative expenses for the wind down and the authorized chapter 11 attorney's fees before the case converted.

   *i.   The Trustee's Involvement*

The case converted to chapter 7 on November 20, 2014. [Case No. 1:13-bk-16079-SDR, at Doc. No. 186]. Mr. Jahn was appointed as the Trustee to administer the remaining assets of the case. The Trustee testified that, following his appointment, he investigated what assets remained to administer for the benefit of the estate. [Testimony of Richard Jahn, at 1:21:00]. During his investigation, the Trustee was referred to Ms. Chastain by one of the Debtor's bankruptcy attorneys, Jeffrey Maddox.[8] [*Id.* at 11:22:12]. Mr. Maddox was not sure whether the CD had been conveyed or whether the APA exhibits had been filled out so he referred the Trustee to Ms. Chastain. [*Id.* at 11:22:19, 2:05:21].

After the sale closed, Ms. Chastain became an employee of the Plaintiff's. [Testimony of Joe Mason, at 2:59:18]. She testified that, prior to the sale closing, she had been an accounting

---

8 Mr. Maddox was a bankruptcy attorney for the Debtor but, according to the testimony at trial, was not involved in negotiating the agreement.

manager for the Debtor and became its Treasurer in 2008. [Testimony of Carmin Chastain, at 3:52:35]. Although no exact date was provided, Ms. Chastain testified that she became the CFO of the Plaintiff within a year after the sale closing. [*Id.* at 4:13:53]. When the Trustee spoke with Ms. Chastain, she brought the CD to his attention. [Testimony of Richard Jahn, at 1:21:15]. He testified that she explained to him the history of the CD and the process that she had gone through to obtain prior reductions in its balance. [*Id.* at 1:42:30]. The Trustee testified that Ms. Chastain told him that the CD was in the Debtor's name and was one of the assets that remained to be administered for the estate but that it would be "hard to get" a reduction in the amount of the CD. [*Id.* at 1:34:54, 1:50:07]. The Trustee testified that, while Ms. Chastain was CFO of the Plaintiff, she told him that the Debtor "owned" the CD. [*Id.* at 1:50:05-1:50:26]. The court finds the Trustee's testimony on this point to be credible and is convinced that Ms. Chastain left him with the impression that he could liquidate the CD for the benefit of the Debtor's estate.

At trial, Ms. Chastain offered different answers to the question of which party she believed owned the CD. At times, she indicated her belief that the Debtor retained the CD in the sale. [Testimony of Carmin Chastain, at 3:56:48, 3:59:50]. However, at other times, she indicated that she did not know which assets were excluded from the sale or which party owned the CD. [*Id.* at 3:59:00]. She admitted that she told the Trustee the CD was in the Debtor's name and where he could find it. [*Id.* at 3:56:30]. She also admitted that she was aware the Trustee was liquidating the CD and provided him with information to help him reduce the amount of the CD. [*Id.* at 3:58:10]. However, she did not recall specifically telling the Trustee that he, on behalf of the Debtor's estate, "owned" the CD. [*Id.* at 3:56:37, 4:07:49]. Emails exchanged by Ms. Chastain and the Trustee between January 2015 and April 2016 document her assistance in the Trustee's efforts to liquidate the CD. [Tr. Ex. 29-34].

The court finds Ms. Chastain's testimony regarding who she thought owned the CD and whether she told the Trustee that the Debtor owned the CD to be inconsistent. It is apparent from her testimony that at some point after the sale she believed the CD was the Debtor's property and told the Trustee as much. She is now no longer sure she was right. The Trustee proceeded over a period of several months to gather information from her regarding the workers' compensation claims and to pursue reduction of the CD. Ms. Chastain admitted that she helped the Trustee in this regard. [Testimony of Carmin Chastain, at 3:58:15]. She testified that after closing she continued to do work on behalf of the Debtor. [*Id.* at 4:05:26]. This work would have occurred while she was employed by the Plaintiff.

Ms. Chastain also provided inconsistent testimony regarding whether her superiors knew she was talking to the Trustee and helping him liquidate the CD. At one point, she testified that she had not told Mr. Jones, Mr. Mason, Mr. Bruce Bellusci, the President of the Plaintiff, or Mr. Jerrold Farinash, counsel for the Plaintiff, that the Trustee had asked her about the CD. [*Id.* at 4:05:54]. She reiterated that Mr. Mason specifically did not know that she was talking to the Trustee. [*Id.* at 4:14:10]. Later, she admitted that Mr. Mason did know she was "providing [the Trustee] with information" but explained that Mr. Mason did not know "the details of the information." [*Id.* at 4:14:18]. She also testified that Mr. Bellusci knew that she "was providing information [to the Trustee] on behalf of the company but did not know the details." [*Id.* at 4:14:40]. She testified that no one at the Plaintiff told her what to do on behalf of the Debtor and that her work for the Debtor was at the direction of the Debtor's bankruptcy attorneys. [*Id.* at 4:05:35]. She also testified that she was aware she was being compensated by the Debtor's estate for her time helping the Trustee obtain this information. [*Id.* at 4:14:54]. The court takes judicial notice that an application for reimbursement of her time was filed by counsel for the Plaintiff on

January 19, 2015, and was granted on February 12, 2015. [Case No. 1:13-bk-16079-SDR, at Doc.
Nos. 212, 214].

Mr. Jones testified that he thought someone who worked for the Plaintiff contacted the
state about the CD following the sale. [Testimony of Allan Jones, at 3:35:02]. Mr. Jones believed
he had directed Mr. Mason to call the state. [*Id.* at 3:36:24]. Mr. Mason testified, however, that he
had not contacted the state about the CD. [Testimony of Joe Mason, at 3:08:20]. Mr. Mason also
testified that he had not contacted the bank following the sale because the CD could not be
collected until 2021 and because the CD was in the name of the Debtor, which name the Plaintiff
had taken after the sale. [*Id.* at 3:08:30]. Based on this testimony, the court finds that following the
sale, despite Mr. Jones' instructions to do so, no one from the Plaintiff contacted either First
Tennessee Bank or the Tennessee Department of Commerce and Insurance to claim the CD.

The CD matured at First Tennessee Bank on August 15, 2014, and was neither renewed
nor liquidated by the Plaintiff at that time. [Tr. Ex. 13]. First Tennessee Bank sent the notice to the
Debtor's address, which by that time was also the Plaintiff's address. Ms. Chastain forwarded the
renewal notice to the Trustee, who then renewed the CD. [Testimony of Carmin Chastain, at
4:00:10].

The Plaintiff's position that the CD had no value persisted in its financial reporting after
the sale. The Plaintiff did not list the CD as an asset on its audited financial statements going back
to December 31, 2014, even to reflect its contingent status. [Testimony of Robert Belcher, at
9:53:11; Tr. Ex. 12]. Mr. Belcher did tax work and acted as an accounting auditor for both the
Debtor before the sale and the Plaintiff after the sale. [*Id.* at 9:45:25, 9:46:11]. Mr. Belcher set up
the Plaintiff's financial records and audited its first financial statements following the sale. [*Id.* at
9:47:20]. He testified that his principal contacts in preparing the Plaintiff's financial statements

16

were Ms. Chastain and Mr. Mason but that other members of his team also worked with other members of the Plaintiff's accounting staff. [*Id.* at 9:46:20, 9:52:07]. After the sale, Ms. Chastain provided him with a list of assets for the Plaintiff's opening balance sheet. [*Id.* at 10:01:45, 10:02:22]. Mr. Belcher testified that there was no reference to the CD in the information provided to him. [*Id.* 9:51:35]. Ms. Chastain acknowledged that she did not include the CD in the Plaintiff's financial statements after the sale but could not explain why. [Testimony of Carmin Chastain, at 3:56:56]. Mr. Belcher testified that there was never any indication in the documents that he reviewed that the CD was an asset of the Plaintiff's. [Testimony of Robert Belcher, at 9:51:55]. Although the Plaintiff's financial statements were compiled with the Plaintiff's assistance and reviewed by the Plaintiff's management and accounting staff, no one from the Plaintiff ever mentioned the CD to Mr. Belcher nor was any correction made to the financial statements to include a reference to the CD. [*Id.* at 10:00:36; Tr. Ex. 12].

The Trustee received $485,795.41 from the Debtor's accounts on December 5, 2014, consisting of cash left from the bank accounts at closing and remaining sale proceeds. [Tr. Ex. 26, at 1]. The Trustee obtained a reduction from the CD with the permission of the state of $101,300 in October 2016, and these funds were deposited into the chapter 7 trust account. [*Id.* at 4; Testimony of Richard Jahn, at 1:46:27].

The Trustee filed a Notice of Interim Distribution with the court on February 14, 2017. [Case No. 1:13-bk-16079-SDR, Doc. No. 250]. The notice reflected that the balance on hand in the estate was $670,800.68, which would have included the $101,300 liquidated from the CD. [*Id.* at 3]. The notice also provided that, following the $500,000 distribution, $170,800.68 would be left after distribution. [*Id.*]. The Trustee testified that he would not have made this distribution had he known that the Plaintiff would claim ownership of the CD. [Testimony of Richard Jahn, at

17

1:37:55]. The court finds that the Trustee relied on Ms. Chastain's representations that any proceeds of the CD he received would be available to him to administer the case.

Following the distribution, the Trustee was able to reduce the amount of the CD pledged to the state by another $75,000 in June 2017, and these funds were deposited into the chapter 7 trust account. [Tr. Ex. 26 at 9; Testimony of Richard Jahn, at 1:46:27].

On September 12, 2017, the Trustee filed a motion to sell the CD, representing the funds still pledged to the state in the amount of approximately $150,000. [Case No. 1:13-bk-16079-SDR, Doc. No. 254]. On September 21, 2017, the Plaintiff objected on the basis that the CD was property that it had purchased in the sale and was, therefore, not estate property subject to liquidation by the Trustee. [*Id.* at Doc. No. 255]. The Trustee testified that no one had raised a dispute about ownership of the CD until September 2017. [Testimony of Richard Jahn, at 1:39:09].

As of the trial date, the remaining CD was titled in the Trustee's name as trustee for the Debtor in the amount of $150,398.32, and pledged to the State of Tennessee with a maturity date of July 27, 2021. [Tr. Ex. 19, at 1-5; Testimony of Richard Jahn, at 1:48:38]. The Trustee testified that he had funds in the estate of approximately $200,000 plus the remaining CD. [Testimony of Richard Jahn, at 11:24:50, 11:33:23]. The Trustee submitted his total attorney time from November 2014 to June 2017 was $22,370. [Tr. Ex. 27; Testimony of Richard Jahn, at 11:35:30]. He testified that his time and expenses attributable to pursuing the CD were less than $22,370, but he did not provide an exact amount. [Testimony of Richard Jahn, at 11:36:00]. He estimated that his trustee's fee would be $43,000, which is yet to be paid from the estate. [*Id.* at 11:32:39]. He testified that his legal expenses to defend this suit had been approximately $30,000.[9] [*Id.* at 11:25:39].

---

9 The court notes that since trial, the Trustee's attorney has filed a Fourth Application for Interim Fees and Reimbursement of Expenses requesting the payment of fees and expenses totaling $22,426.31. [Case No. 1:13-bk-

The Trustee provided inconsistent testimony as to whether the Debtor's estate would be administratively insolvent if he were required to turn over the remaining CD, worth approximately $150,000, as well as the approximately $176,300 he already liquidated. At one point he claimed that under this scenario, the Debtor's estate would not have sufficient cash to pay all of the administrative claims and there would be no more distribution to unsecured creditors. [*Id.* at 1:19:10]. However, he later testified that under this scenario it would not be necessary for him to recover the distributions he had already paid to creditors to cover the administrative expenses of the estate. [*Id.* at 2:03:44]. The Trustee testified that if he were allowed to keep the approximately $175,000 of the CD that he had already liquidated, the damage to the estate would be in not getting the remaining funds in the CD. [*Id.* at 2:02:54]. The Trustee testified that the CD is the last remaining item to administer before closing the estate. [*Id.* at 1:20:33].

## IV. Analysis

The Plaintiff seeks a declaratory judgment that it purchased the CD pursuant to the terms of the agreement. The Trustee contends that the CD was not sold and that he properly exercised control over it on behalf of the Debtor's bankruptcy estate. Depending on whether the CD was sold, the Trustee has also raised the equitable defenses of failure of consideration, laches, and estoppel to the Plaintiff's claim to the CD or its value. Determining whether the Plaintiff and the Debtor intended to convey the CD requires the court to interpret their agreement.

### a.  *Choice of Law*

As the court has previously found, both the APA and bill of sale were executed in Tennessee and contain choice of law provisions selecting Tennessee law as governing. [Tr. Ex. 2,

---

16079-SDR, Doc. No. 306]. As indicated in the application, the court previously approved and the Trustee paid approximately $29,514.73 in fees and expenses to the Trustee's attorney in this litigation. [*Id.* at 2]. The court approved the Fourth Application but ordered the Trustee not to disburse the funds pending resolution of this adversary proceeding. [*Id.* at Doc. No. 320].

at ¶ 11.03; Tr. Ex. 7, at 6, ¶ 7]. Consequently, as the court explained in a prior opinion in this case, the court is required to interpret these documents according to Tennessee law. [*See* Doc. No. 69, at 14].

### b. Doctrine of Merger

Before interpreting the parties' agreement, the court must first determine what documents make up the agreement. The Plaintiff argues that, under the doctrine of merger, the terms of the APA merged into the bill of sale and that, consequently, the court should look only to the bill of sale. Because the bill of sale conveyed "all . . . Assets," the Plaintiff argues that all assets were sold regardless of any ambiguities created in the APA by problems with the exhibits.

Under the doctrine of merger, "when parties to a contract enter into a subsequent agreement concerning the same subject matter as the first contract, the earlier contract merges into the latter contract, and is rescinded and extinguished." *Koshani v. Barton*, No. 3:17-cv-265, 2018 WL 5929230, at *3 (E.D. Tenn. Nov. 13, 2018) (citing *Shree Krishna, LLC v. Broadmoor Inv. Corp.*, No. W2011-00514-COA-R3-CV, 2012 WL 312254, at *14 (Tenn. Ct. App. Feb. 1, 2012)). However, in order for the doctrine of merger to apply, "the successive contracts . . . generally must contain inconsistent terms, such that they cannot be considered supplemental agreements." *Id.*; *see also Great Am. Ins. Co. v. Nelson, Inc.*, 276 F. Supp. 3d 762, 768 (W.D. Tenn. 2017) ("Inconsistency of terms is the crux of the merger doctrine inquiry.").

In this case, there is no relevant inconsistency between the bill of sale and the APA. The bill of sale incorporated the same definition of "Assets" as used in the APA. [Tr. Ex. 7, at 5 ("[C]apitalized terms used but not defined herein have the respective meanings ascribed to them in the Asset Purchase Agreement."]. The Plaintiff asks the court to look only to the bill of sale because it purported to sell "all" of the assets. However, because no definition of "Assets" was

20

given in the bill of sale itself, the court must necessarily look to the APA for the definition. As the

court has previously observed, "[b]ecause the bill of sale use[d] capitalized terms whose

definitions [were] contained in the APA, the court must also consider the APA, including its

multiple exhibits, amended exhibits, and supplements, in order to ascertain the parties' intent."

[Doc. No. 69, at 14]. The lack of inconsistency between the documents, as well as the fact that the

bill of sale specifically referred to definitions found in the APA, leads the court to find that the

APA and bill of sale were not inconsistent in nature and were both part of the parties' agreement.

Accordingly, the court finds that the doctrine of merger is inapplicable and will consider both

documents as appropriate to determine the parties' intent.

### c.  *Contract Interpretation*

In Tennessee, the interpretation of written agreements is a matter of law. *See, e.g., Allstate

Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). The overarching principle of contract

interpretation is "to ascertain and give effect to the intent of the contracting parties." *Individual

Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694 (Tenn.

Jan. 18, 2019) (citation omitted). The court should consider the entire contract when determining

the meaning of any or all of its parts. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704

(Tenn. 2008) (citation omitted). "The interpretation should be one that gives reasonable meaning

to all of the provisions of the agreement, without rendering portions of it neutralized or without

effect." *Id.* (citation omitted). "All provisions in the contract should be construed in harmony with

each other, if possible, to promote consistency and to avoid repugnancy between the various

provisions of a single contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citation

omitted).

When ascertaining the intent of the parties, the court looks first to the plain meaning of the

words used in the contract to determine whether the language is ambiguous. *Allstate Ins. Co.*, 195

S.W.3d at 611 (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-

90 (Tenn. 2002)); *see also* Tenn. Code Ann. § 47-50-112(a) ("All contracts . . . in writing and

signed by the party to be bound . . . shall be prima facie evidence that the contract contains the true

intention of the parties, and shall be enforced as written. . . ."). Generally, language in a contract

is ambiguous when it is "susceptible to more than one reasonable interpretation." *Allstate Ins. Co.*,

195 S.W.3d at 611. "If the language is clear and unambiguous, the literal meaning controls the

outcome of the dispute." *Id.* However, if the contract is ambiguous, then "the court must apply

established rules of construction to determine the intent of the parties." *Id.* at 611-12 (citation

omitted).

     *d.  Ambiguities in the Agreement*

     The court has previously found as a matter of law that the parties' agreement was

ambiguous. In its prior opinions denying the Plaintiff's motions for partial judgment on the

pleadings and summary judgment, the court identified several ambiguities within the four corners

of the parties' agreement. [Doc. No. 27, at 11-15; Doc. No. 69, at 15-18]. In its opinion denying

partial summary judgment, the court summarized its findings regarding these ambiguities.

     First, the court observed that the Excluded Assets exhibit, Exhibit 2.05, was blank and did

not identify any assets even though utility deposits were expressly excluded based on Section 2.05.

[Doc. No. 69, at 15]. The court found that the omission on the Excluded Assets exhibit of certain

assets that were clearly excluded from the sale, such as utility deposits, created ambiguity.[10] [*Id.*].

The court could not ascertain from the documents alone whether the Excluded Assets exhibit was

incomplete or intentionally left blank. [*Id.*].

---

10 The court notes that the Debtor's cash was also excluded from the sale yet not listed on the Excluded Assets exhibit.

The court found that this ambiguity was heightened by "conflicting clauses with respect to the deadline for parties to make changes to the Excluded Assets exhibit." [*Id.*]. As the court noted, Section 2.05 provided that the parties "may mutually agree to amend, modify, or supplement" Exhibit 2.05 "[s]ubsequent to the Effective Date . . . *until the Closing*," whereas Exhibit 2.05 itself provided that the parties would work to finalize the exhibit "as soon as practicable *after the Effective Date*." [*Id.*]. The court found that the language of the agreement created "two different timelines for supplementing the Excluded Assets exhibit, one with a deadline at closing, and one without a specific deadline." [*Id.*]. Exhibit 2.05 was never updated, and, because an ambiguity was created as to when the exhibit was to be finalized, the court could not determine whether "Exhibit 2.05 was supposed to be completed but was not or whether it was purposefully left blank because no assets were to be excluded." [*Id.* at 15-16].

The court also found that Section 2.01's statement that the assets being sold were "more particularly described on Exhibit 2.01" created ambiguity when read together with Paragraph 1.02(b)'s definition of Assets to mean "all . . . assets" except those defined as Excluded Assets. [*Id.* at 16]. The court found these provisions ambiguous because Section 2.01 placed an additional limitation on which assets were to be sold, i.e., those more particularly described on Exhibit 2.01, that was not contemplated by the definition of the assets to be sold in Section 1.02(b), i.e., all assets except the Excluded Assets. [*Id.*].

Finally, the court noted the ambiguities related to the multiple versions of Exhibit 2.01 and the difficulty of determining which version of the exhibit was intended to be included in the agreement. [*Id.* at 16-18]. The court addresses this issue in more detail below. Suffice to say that the court previously found that it could not determine from the four corners of the agreement which of the three versions of Exhibit 2.01 the parties produced was the operative exhibit. [*Id.*].

23

e. *Use of Parol Evidence*

In its prior opinion denying summary judgment, the court found that these ambiguities left the court unable to interpret the contract based on its plain language. When a contract is ambiguous, the court may consider parol evidence, "including the contracting parties' conduct and statements regarding the disputed provision[s], to guide the court in construing and enforcing the contract." *Allstate Ins. Co.*, 195 S.W.3d at 612 (citations omitted). It is also appropriate "to consider evidence of surrounding facts and circumstances to determine the intent of the parties." *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 891-92 (Tenn. July 22, 2019) (citation omitted). In its prior opinions, the court signaled to the parties that it found parol evidence was needed to resolve the ambiguity in the agreement, and the parties provided such evidence both at the summary judgment stage and at trial.

An issue was raised at trial with respect to whether the ambiguity in the agreement was patent or latent. Traditionally, Tennessee courts have declined to consider parol evidence to resolve a patent ambiguity but have considered such evidence to resolve a latent ambiguity.[11] *See Ward v. Berry and Assocs., Inc.*, 614 S.W.2d 372, 374 (Tenn. Ct. App. 1981). As the Tennessee Court of Appeals has explained,

> A patent ambiguity is one produced by the uncertainty, contradictoriness or deficiency of the language of an instrument, so that no discovery of facts or proof of declarations can restore the doubtful sense without adding ideas which the words do not sustain. A latent ambiguity is one where the equivocality of expression or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts without altering or adding to the written language or requiring

---

11 The court notes that there has been some criticism of the latent versus patent distinction and it is not uniformly applied. *See, e.g.*, *Richardson v. James Brown Contracting, Inc.*, No. E2009-01785-WC-R9-WC, 2010 WL 3258612, at *7 (Tenn. Workers' Comp. Panel Aug. 18, 2010) (noting that the Tennessee Supreme Court "has generally remained silent concerning the distinction between patent and latent ambiguities when applying the ambiguity exception to the general rule excluding parol evidence") (collecting cases); *see also* Steven W. Feldman, 21 *Tenn. Practice: Contract Law & Practice* § 8:52 (2019) ("The modern (and more sensible) rule is that extrinsic evidence may clarify either a patent or a latent ambiguity.") (collecting cases).

more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases used.

*Moore & Assocs. Memphis LLC v. Greystone Homeowners Ass'n Inc.*, No. W2016-00721-COA-R3-CV, 2017 WL 244112, at *4-5 (Tenn. Ct. App. Jan. 20, 2017) (quoting *Ward,* 614 S.W.2d at 374) (internal quotations omitted).

At trial, the Trustee argued that the ambiguities in this case were patent, or apparent from the face of the documents. However, the court is not persuaded that is entirely the case. To be sure, there are examples of patent ambiguities in the parties' agreement. For example, the fact that Section 2.05 and Exhibit 2.05 contained different deadlines for when the Excluded Assets exhibit was to be finalized is a patent ambiguity. The words on the page do not resolve the question because different answers are provided in different places. However, the central question of the case, i.e., whether the CD was included in the sale or not, is a latent ambiguity. A latent ambiguity is one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." *Horadam v. Stewart*, No. M2007-00046-COA-R3-CV, 2008 WL 4491744, at *6 (Tenn. Ct. App. Oct. 6, 2008) (quoting Black's Law Dictionary 88 (8th ed. 2004)). "Latent ambiguities most often arise in relation to the person and the thing identified in the document and 'exist when the words of a written instrument are plain and intelligible, yet have capability of multiple meanings given extraneous facts.'" *Id.* (quoting *Hargis v. Fuller*, M2003-02691-COA-R3-CV, 2005 WL 292346, at *6 (Tenn. Ct. App. Feb. 7, 2005)). In this case, the overarching question of whether the CD was conveyed within the expression "all Assets" is a latent ambiguity. It is only when one tries to determine who owns that particular asset, which was neither specifically included nor excluded from the sale but arguably contained within the broad language of "all Assets," that the agreement becomes ambiguous. It is consideration of the CD that renders the agreement ambiguous and leads the court to consider parol evidence.

The court also finds that consideration of parol evidence is appropriate in this case because the parties' agreement was not fully integrated. A contract is fully or completely integrated "when it is intended to be the complete and exclusive statement of the parties' agreement." *Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 696 (citations omitted). In Tennessee, "[t]he parol evidence rule protects a completely integrated written contract from being varied or contradicted by extraneous evidence[.]" *Miller v. Miller*, No. M2017-01867-COA-R3-CV, 2018 WL 2411591, at *5 (Tenn. Ct. App. May 29, 2018) (quoting *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 612 (Tenn. Ct. App. 1990)). As the Tennessee Supreme Court has explained, "[w]hen a contract is fully integrated, the parol evidence rule does more than prohibit the use of pre-contract negotiations to contradict the contract's terms; it also prohibits the use of pre-contract negotiations within the scope of the agreement in a way that would supplement or limit its terms, even if that evidence is consistent with the written terms of the contract." *Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 696 (citations and emphasis omitted). On the other hand, when a contract is only partially integrated, "it may not be contradicted by parol evidence, but may be supplemented by consistent, additional terms." *Id.* at 696-97 (quoting Steven W. Feldman, 21 *Tenn. Practice: Contract Law & Practice* § 8:50).

In this case, the court finds that the agreement was not the final expression of the parties' agreement. *See, e.g., Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 864 (Tenn. Ct. App. 2000) (finding that agreement that omitted "significant" terms and was "deficient so far as detailing the actual substance of the parties' deal . . . clearly was not intended as the final expression."). The court acknowledges that the APA contains an integration clause. [Tr. Ex. 2, at ¶ 11.02]. The court notes, however, that the parties subsequently executed a "Closing Agreement" and bill of sale, which each contain supplemental terms to the APA yet neither of which contain

integration clauses. [Tr. Ex. 7, at 3-7]. Moreover, the testimony at trial made clear that certain aspects of the parties' agreement were made orally or were otherwise not included in the four corners of the written agreement. For example, utility deposits were included on the April 16 Exhibit 2.01 list of assets to be sold [Tr. Ex. 3, at 26], but it is undisputed that they were kept by the Debtor in the sale. Likewise, the Plaintiff paid off the DIP lender's loan while the Debtor kept its cash accounts, an arrangement not provided for in the agreement. Most importantly, the parties were still negotiating the lists of assets to be sold and excluded at the time the court approved the APA as evidenced by the incomplete exhibits. The parties continued to negotiate what assets were to be sold and what assets the Debtor needed to wind up its operations through closing and perhaps thereafter. The exhibits that were included at closing would lead one to believe that only accounts receivable and inventory were conveyed and that the Excluded Assets exhibit was yet to be finalized. Given the fact that some of the exhibits were never finalized but the parties acted as though a complete sale of the Debtor's business had occurred, the court concludes that the contract was not fully integrated and that some portion of the parties' agreement existed outside of the written documents. In this situation, it is appropriate for the court to consider the oral testimony of the parties to the agreement with respect to whether or not they intended for the CD to be conveyed.

The court also finds that it is appropriate to consider parol evidence with respect to the actions of the Plaintiff and its employees after the sale. In its prior opinion on summary judgment, the court observed that Tennessee follows the rule of practical construction, which provides "that the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered." [Doc. No. 69, at 20]; *see Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 693 n.21 (quoting *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983)); *see*

*also Beckwith v. LBMC, P.C.*, No. M2017-00972-COA-R3-CV, 2019 WL 1306201, at *5 (Tenn.

Ct. App. Mar. 21, 2019) ("The parties' actions in carrying out a contract can be strong evidence of

the intended meaning of the contract, employed by courts as a rule of practical construction.")

(collecting cases). The rule of practical construction applies when a contract is ambiguous.

*Beckwith*, 2019 WL 1306201, at *5. At trial, the court admitted evidence related to the actions of

the Plaintiff and its employees following the sale to determine whether those actions were

consistent with the CD having been conveyed to the Plaintiff. The court also found this evidence

relevant to the Trustee's equitable defenses.

> *f.   Interpretation of the Agreement*

The court will now examine the terms of the agreement to ascertain the parties' intent. The

court will look first to the bill of sale. The bill of sale purported to sell all of the Debtor's "right,

title and interest in, to and under the Assets." [Tr. Ex. 7, at 5, ¶ 1]. However, the bill of sale

specifically excluded "Assets that constitute the Intangible Personal Property, the Land and the

Improvements." [*Id.*]. The term "Assets" was not defined in the APA; however, as noted above,

the bill of sale provided that terms not defined in the bill of sale had the meanings ascribed to them

in the APA. [*Id.*].

Turning to the APA, it is clear that the CD was not included in the definition of "Intangible

Personal Property" and was thus not excluded by the bill of sale.[12] [Tr. Ex. 2, at 9 ¶ 1.02(l)]. The

definition of "Assets" used in the APA was very broad and could have conceivably encompassed

a certificate of deposit under the terms "deposits" or "refunds." [*Id.* at ¶ 1.02(b)]. However, the

---

12 "Intangible Personal Property" was defined in the APA as "the trade name 'Hardwick Clothes' under which the
business is operated; any Intellectual Property of Seller whether relating to Seller's ownership and operation of the
Business or otherwise; Seller's rights to any engineering and architectural plans and specifications, drawings, studies,
and as-built surveys relating to the Land and the Improvements thereon; and any other intangible personal property
used in connection with Seller's ownership or operation of the Business, including, but not limited to, that Intangible
Personal Property specified on Exhibit 2.01 hereto." [Tr. Ex. 2, at ¶ 1.02(l)].

significance of the broad definition of Assets was clouded by two other limiting phrases in the

APA. The first limitation was in the "Agreement to Sell and Purchase" paragraph, which explained

that the Assets to be sold were those "more particularly described on Exhibit 2.01." [*Id.* at ¶ 2.01].

The second limitation was found in the definition of Assets itself, which specifically excluded the

"Excluded Assets," also a defined term.  [*Id.* at ¶ 1.02(b), (h)]. The definition of Excluded Assets

referred to Section 2.05, which in turn provided that the Excluded Assets were "described more

particularly on Exhibit 2.05." [*Id.* at ¶¶ 1.02(h), 2.05].

Thus, the question of which assets were sold and which were excluded focuses on Exhibit

2.01 (the list of assets to be sold) and Exhibit 2.05 (the list of excluded assets). The CD was not

listed on either exhibit.

Turning first to Exhibit 2.01, there is a disagreement between the parties as to which

version of Exhibit 2.01 was included in the final agreement. In particular, the parties disagree about

whether the April 16 version of Exhibit 2.01, which was filed on the court's docket but not included

in the closing package, was part of the parties' agreement.

Exhibit 2.01 was an itemized list of the assets to be sold. A prior version of the exhibit,

which was in the APA signed on March 18, 2014, and submitted for court approval, was blank and

contained only the phrase that, "[t]he Parties agree to work together, in good faith, to finalize this

exhibit as soon as practicable after the Effective Date." [Tr. Ex. 2, at 31]. On April 16, 2014, the

Debtor filed a new version of Exhibit 2.01 on the court's docket without notice or explanation.

This version contained a long list of various kinds of assets, the very last sentence of which was

the catch-all provision, listing "[a]ny and all Other Assets of any nature known or unknown,

whether or not set forth above not otherwise excluded as set forth on Exhibit 2.05." [Tr. Ex. 3, at

47]. However, the version of Exhibit 2.01 filed at closing on June 16, 2014, was substantially

different than the April 16 Exhibit 2.01. It contained only a list of accounts receivable and inventory but, critically, did not contain the catch-all provision.

The Plaintiff contends that the version of Exhibit 2.01 filed at closing was intended to supplement or update, rather than replace, the earlier filed April 16 version. This would have the effect of including the catch-all provision in the parties' agreement. The Trustee contends that the version filed at closing, which did not contain the catch-all provision, replaced the earlier versions and was the operative version of Exhibit 2.01. He also disputes whether the catch-all provision even applied to an asset such as the CD because that provision was located below the category for "Clothing Pattern and Designs," a category in which the CD obviously would not fit.

The court finds that the June 16 Exhibit 2.01 filed at closing was intended to be an update or supplement to the April 16 Exhibit 2.01 and that both exhibits, therefore, were part of the parties' final agreement. The court heard testimony that the catch-all provision was a negotiated term and that a clerical error led to the April 16 exhibit's omission in the final closing package. The court finds this testimony to be credible. To find otherwise would lead to the absurd result that the only assets conveyed were the receivables and inventory listed on the June 16 Exhibit 2.01. This is clearly not what the parties to the agreement intended nor how they acted following the sale. The Plaintiff continued operating as a new business using assets that were listed on the April 16 exhibit. It is apparent from the Trustee's actions in liquidating the bankruptcy estate that he understood that more than just accounts and inventory had been sold.

The court also disagrees with the Trustee's argument that the catch-all provision only applied to the category of assets titled "Clothing Pattern and Designs." Although the catch-all provision was located on the same page as the Clothing Pattern and Designs asset category, it was in a bold font, the same as the titles of other asset categories. This bold font set the catch-all

provision apart from the individual assets in the Clothing Pattern and Designs category. In addition, on the same page immediately prior to the catch-all provision were the listings: "All As Built Plans, Drawings, Diagrams and Blue-Prints on file in the Company's on-premises vault," and "All Asserted and Un-asserted Claims for Refunds, Compensation, Abatements, Import/Export Fees or Tariffs, and Other Amounts Due Related to all Assets of the Company." *Id.* These descriptions obviously described different categories of assets than those that would be found in Clothing Pattern and Designs. Finally, the inclusion of the catch-all provision as the final item listed on Exhibit 2.01 was consistent with Mr. Mason's testimony that the provision was included to capture any possible forgotten asset given the Debtor's long operating history. It makes sense that this provision would be the final item listed on the exhibit of assets to be sold.

Having found that the April 16 and June 16 Exhibits 2.01 were both part of the parties' agreement, the court is obliged to note the oddity that the CD was not listed on either version of the exhibit. These exhibits detailed assets as insignificant as a button, yet failed to mention a $325,000 asset in a $1,900,000 sale. Likewise, Exhibit 2.05 failed to list the CD as being excluded from the sale.

The parties' testimony indicated that no one recalled finalizing Exhibit 2.05. Ms. Chastain did not prepare a final exhibit. Neither Mr. Hopper nor the Debtor's attorneys recalled whether Exhibit 2.05 was ever finalized. The Plaintiff argues that it was not completed because there were no assets to be excluded from the sale. The Trustee contends that there were other items that should have been listed as Excluded Assets such as the utility deposits, bank account deposits, and, most importantly, the CD, all of which he argues were excluded from the sale but never included on Exhibit 2.05.

The written agreement simply does not capture the parties' final agreement with respect to which assets were to be excluded. It is apparent that certain assets were excluded from the sale but were never put on the Excluded Assets exhibit. Consequently, the court finds the parties' testimony necessary and effective in resolving these ambiguities.

First, the unanimous testimony of the parties who negotiated the agreement, including Mr. Jones and Mr. Mason on behalf of the buyer and Mr. Hopper and Mr. Aiken on behalf of the seller, was that the parties intended for "all" assets to be sold. The court finds this testimony credible. The parties were less clear as to whether the CD was specifically discussed as an asset to be sold. Mr. Aiken did not recall specific negotiation about the CD, nor did Mr. Mason. However, Mr. Jones and Mr. Hopper both testified that they were aware of the CD. To the extent that the principals to the deal were aware of the CD and intended for the sale to be of all assets, this is strong evidence of an intent to convey the CD.

Mr. Mason explained that he was aware of the CD's existence prior to the sale, but had determined through his conversations with Ms. Chastain that the CD had little present value because it was pledged to the state subject to workers' compensation claims until 2021. Mr. Mason stated that he relayed his view of the CD's value to Ms. Chastain. Mr. Mason's position may ultimately be exposed as incorrect because it appears unlikely that additional claims will be made against the CD before it the claims run-off ends in 2021. However, the court finds his testimony credible to the extent that, at the time of the sale, he believed the CD had little present value and that it would be difficult to obtain a release of the funds from the state.

Mr. Mason also testified that he was responsible for the inclusion of the catch-all provision in the agreement and proposed the language ultimately used for that provision. Mr. Mason testified that he believed the catch-all provision was necessary because it was impossible to determine if

the sale had covered all the assets being acquired in daily operations. As the court found above, the catch-all provision was incorporated into the parties' final agreement, and its inclusion provides additional evidence that the parties intended to convey assets that were not specifically listed in the exhibits.

The Trustee, who was not a party to the agreement, counters with evidence that shows the Plaintiff did not act as though it owned the CD following the closing. The Trustee points out that the Plaintiff did not disclose the CD as an asset on its financial statements following the sale. The Trustee also notes that no one employed by the Plaintiff contacted First Tennessee Bank or the Tennessee Department of Commerce and Insurance to change the name on the CD or claim it. When the CD matured in August 2014, the Plaintiff did not renew or liquidate it. In fact, when Ms. Chastain received the notice of maturation, she forward it to the Trustee who then renewed the CD.

The Trustee makes much of the Plaintiff's failure to change the name and address on the CD. However, because the Plaintiff bought the Debtor's business location and name, there was nothing to change on the face of the CD related to the company name or its address. The court finds the Plaintiff's conduct in this respect to be consistent with its belief that it owned the CD and had to wait for the workers' compensation run off period to end before the state would release its interest.

The Trustee also points to his interactions with Ms. Chastain following the sale. When the Trustee contacted Ms. Chastain, she told him that the CD was in the Debtor's name and proceeded over a period of time to provide him with information necessary to liquidate the CD for the benefit of the Debtor's estate. The court has previously found the Trustee's testimony credible to the extent that Ms. Chastain left him with the impression that he could liquidate the CD in this manner.

33

However, with respect to whether or not the CD was actually conveyed, the court puts less stock in Ms. Chastain's statements to the Trustee. Put simply, Ms. Chastain did not know whether the CD had been sold, and her statements in any event would not have had an effect on whether the CD was actually sold. To the extent that Ms. Chastain led the Trustee to believe that the CD was still owned by the Debtor, her beliefs were not based on any statements made by Mr. Hopper or Mr. Aiken, who negotiated on behalf of the Debtor. Nor did Mr. Mason or Mr. Jones tell her that the Plaintiff was leaving the CD behind in the sale. Ms. Chastain did not testify that she was aware of the addition of the catch-all provision. Mr. Mason's testimony that he thought the CD had little value provides an explanation as to why the Plaintiff did not push for its inclusion in the list of assets to be sold. It is apparent from Ms. Chastain's testimony that she misunderstood Mr. Mason's statement about the value of the CD. In her mind, his statement that the CD was not worth having meant that it was not conveyed.

This mistake explains why she did not include the CD in her drafts of Exhibit 2.01 listing the assets to be conveyed. It also explains why she did not list the asset when preparing schedules for the Plaintiff's financial statements. The Plaintiff's failure to renew the CD is also related to Ms. Chastain's mistaken belief. She sent the renewal notice to the Trustee without any discussion about renewal with her superiors.

The Trustee makes a compelling argument that the Plaintiff's conduct after the sale is the best evidence of the parties' intentions. The problem with the Trustee's argument is that the majority of this conduct is directly attributable to Ms. Chastain's misunderstanding of the agreement. However, the court ultimately finds that it is irrelevant whether Ms. Chastain, who was not involved in negotiations and had no personal knowledge of the relevant agreement terms, believed that the CD had been conveyed. The question is whether the parties to the agreement

intended to convey the CD, not whether Ms. Chastain knew their intentions. The Trustee has not demonstrated that Ms. Chastain was a decision maker for the Debtor during the sale negotiations nor that she had any personal knowledge as to whether the CD was sold or excluded. Her own testimony was that she was not included in the discussion of the catch-all provision and did not prepare the Excluded Assets schedule. The court finds that Ms. Chastain's role in the sale was to provide information to the decision makers, not to negotiate what would be sold.

When the parties' testimony is put together with the written documents, the court concludes that the parties intended to convey the Debtor's interest in the CD. This conclusion is based primarily on the parties' intent, both written into the agreement and elicited through testimony, that all of the assets of the Debtor were to be conveyed to the Plaintiff. The parties were aware of the CD and made no specific exclusion of it from the sale. The parties included a catch-all provision to cover whatever assets may have been forgotten in the sale of this more than century-old company. The court would simply have to overlook too much to find that the CD was not conveyed in a sale for substantially all assets with an operative catch-all provision supported by consistent testimony from all of the parties to the negotiations. Although the post-sale conduct of the Plaintiff through its employees appears to be contradictory to its current position on ownership, the court concludes that the conduct is insufficient to outweigh the other evidence of the parties' intent to convey the CD.

For the above stated reasons, the court concludes that the parties intended to convey the Debtor's interest in the CD and, therefore, the court finds that it was sold by the agreement and belongs to the Plaintiff.

g. *Affirmative Defenses*

Having found that the CD was conveyed pursuant to the parties' agreement, the court turns now to the Trustee's affirmative defenses of failure of consideration, laches, and equitable estoppel.

i.    Failure of Consideration

The Trustee argues that the Plaintiff failed to pay any consideration for the CD and that the amount paid by the Plaintiff for the assets in the closing package was "grossly inadequate." [Doc. No. 52, at 7].

"Consideration is a necessary element to the formation of a legal contract." *Campbell v. Matlock*, 749 S.W.2d 748, 751 (Tenn. Ct. App. 1987). In general, "a contract that is unsupported by consideration is unenforceable." *Regions Bank v. Bric Constructors, LLC*, 380 S.W.3d 740, 761 (Tenn. Ct. App. 2011) (citation omitted). "Failure of consideration is a good defense to an action on a contract." *Toliver v. Wall*, No. M2006-00910-COA-R3-CV, 2007 WL 1890648, at *2 (Tenn. Ct. App. June 28, 2007) (citations omitted). A contract signed by the party sought to be bound creates a presumption that the contract was supported by consideration, and the burden to overcome this presumption is on the party asserting a lack of consideration. *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 189 (Tenn. Ct. App. 2010) (citation omitted); *see also* Tenn. Code Ann. § 47-50-103) ("All contracts in writing signed by the party to be bound, or the party's authorized agent and attorney, are prima facie evidence of a consideration.").

"Generally, it is not required that consideration be adequate in the sense that it represents actual value . . . and a contract will not be set aside for mere inadequacy." *Cumberland Props., LLC v. Ravenwood Club, Inc.*, No. M2010-01814-COA-R3-CV, 2011 WL 1303375, at *9 (Tenn. Ct. App. Apr. 5, 2011) (citations omitted). As the Tennessee Court of Appeals has explained:

> The law distinguishes a complete lack of consideration, or failure of consideration, from inadequate consideration. *Griffin v. Simmons,* 61 Tenn. 19, 1872 WL 4174 at *1 (Tenn. December Term 1872). The former is recognized as a defense, but the latter is not. *Id.* at *2; *compare* Tenn. Code Ann. § 47–50–104 (2001) (recognizing "want or failure" of consideration as a defense), *with* Tenn. Code Ann. § 47–50–103 (2001) (recognizing a presumption of consideration to support any written contract); *see also Pyburn v. Bill Heard Chevrolet,* 63 S.W.3d 351, 358 (Tenn. Ct. App. 2001) (rejecting argument that the plaintiff "took nothing from [d]efendant"). As the Supreme Court stated long ago in *Danheiser v. Germania Sav. Bank & Trust,* 137 Tenn. 650, 194 S.W. 1094, 1096 (1917), it is not necessary that the "benefit conferred or the detriment suffered by the promisee . . . be equal to the responsibility assumed. Any consideration, however small, will support a promise."

*Holt v. Wilmoth*, 336 S.W.3d 234, 240 (Tenn. Ct. App. 2010).

In this case, the Debtor received $1,900,000 for the sale of the assets, which the court has found included the CD. The parties were aware of the assets the Debtor owned, including the CD, which was disclosed on Schedule B early in its bankruptcy case. In its Sale Order, the court made findings that the assets were properly marketed, the sale was properly noticed, and the price was the highest and best that could be obtained for those assets. [Tr. Ex. 5, at 5, ¶ 7]. The court also found that the consideration was "fair and reasonable" and of "reasonably equivalent value." [*Id.*].

The court has no evidence that the approval of the sale was procured by fraud or misrepresentation made either to the court or to the Debtor. The findings made in the court's Sale Order are final and have become res judicata on the issue of whether consideration for the sale was adequate. Moreover, even were the issue not res judicata, the court would find the defense of failure of consideration inapplicable. Consideration was paid, and the Trustee's argument goes only to the adequacy of the consideration. The Trustee seeks to parcel out the CD and determine if consideration was specifically paid for that asset. However, where significant consideration was paid for the assets as a whole, the court will not consider whether adequate consideration was paid for and attributed to a particular asset.

ii.   Laches

The Trustee has also raised the affirmative defense of laches. He argues that the Plaintiff should be barred from asserting ownership of the CD now because for years it did nothing to assert ownership or otherwise stop him from liquidating it. He argues that Ms. Chastain's efforts in assisting him should bar the Plaintiff from now claiming ownership of the CD.

Under Tennessee law, the defense of laches is based on the equitable principle that a court "will not intervene on behalf of one who has delayed unreasonably in pursuing his rights." *Montgomery v. Jones*, 355 F. Supp. 3d 720, 728 (M.D. Tenn. Jan. 18, 2019) (citations omitted). "The defense of laches is based on the doctrine of equitable estoppel, and is only applied where the party invoking it has been prejudiced by the delay." *Brown v. Ogle*, 46 S.W.3d 721, 726 (Tenn. Ct. App. 2000) (citing *Freeman v. Martin Robowash, Inc.*, 457 S.W.2d 606, 611 (Tenn. Ct. App. 1970)). The defense of laches "requires an unreasonable delay that prejudices the party seeking to employ laches as a defense, and it depends on the facts and circumstances of each individual case." *Dennis Joslin Co. v. Johnson,* 138 S.W.3d 197, 200 (Tenn. Ct. App. 2003) (citation omitted). "As a general rule, courts will apply the doctrine of laches when the following two elements are present: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *In re Tarkington*, 301 B.R. 502, 507 (Bankr. E.D. Tenn. 2003). Tennessee courts recognize that laches applies "only in comparatively rare cases." *Montgomery*, 355 F. Supp. 3d at 728 (citations omitted). Tennessee courts have explained the doctrine of laches as follows:

> Relief is generally refused by courts of equity, because of lapse of time, only in such cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence . . . The doctrine of laches . . . is not an arbitrary or technical doctrine. No hard and fast rule for its application can be formulated.

*Brown*, 46 S.W.3d at 727 (citations omitted).

The Trustee argues that the Plaintiff unreasonably delayed by failing to oppose his efforts to liquidate the CD until filing an objection on September 21, 2017, to his motion to sell the CD. The Plaintiff counters that the Trustee failed to talk to any decision makers who would have known whether the CD had been sold or to read the documents and inquire about the catch-all provision before launching his efforts to reduce the CD. Neither argument is particularly responsive to the requirement that the delay rendered uncertain the ascertainment of the truth. There have been no allegations of missing witnesses or lost documents. All of the parties to the negotiations were available for trial. The very nature of the asset in dispute put all of the parties on notice that monetization of the asset was going to be a long process. The court finds that the defense of laches is inapplicable to the facts at hand and is not available as a defense for the Trustee.

   iii. Equitable Estoppel

Based on the same facts, the Trustee also asserts the affirmative defense of equitable estoppel. "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Rossi v. Westenhoefer (In Re Rossi)*, No. 11-8048, 2012 WL 913732, at \*10 (B.A.P. 6th Cir. Mar. 20, 2012) (quoting *Heckler v. Comty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59, 104 S. Ct. 2218, 81 L. Ed. 2d 42 (1984)). The party claiming estoppel "must have relied on its adversary's conduct 'in such a manner as to change his position for the worse,' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* (quoting *Heckler*, 467 U.S. at 51 and also citing *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557 (6th Cir. 2009)). The United States Supreme Court has stated that "a hallmark of the doctrine is its flexible application." *Heckler*, 467 U.S. at 59.

The Trustee's basic contention is that Ms. Chastain, as an employee of the Plaintiff, represented to him that the CD was the estate's property to liquidate. He contends that he relied on that representation and thereafter worked to reduce the CD to cash and distribute the cash to creditors. The Trustee was successful in reducing the CD by $101,300 in October 2016. [Tr. Ex. 19, 26]. In February 2017, he made an interim distribution of almost $500,000 based on his belief that the $101,300 belonged to the estate. [Case No. 1:13-bk-16079-SDR, at Doc. No. 250]. Following this interim distribution, the Trustee left the estate with approximately $170,000 with which to complete the case in addition to the $225,000 CD still held by the estate. He obtained a further reduction in June 2017 of $75,000. [Tr. Ex. 19, 26]. Following receipt of the $75,000, the Trustee made payments for authorized expenses of approximately $37,000. [Doc. Nos. 252, 281, 298, 304].

The Trustee testified that he first learned that the Plaintiff was asserting an interest in the proceeds of the CD in September 2017. From December 2014 until September 2017, neither Ms. Chastain nor any other officer of the Plaintiff asserted a claim to the CD or its proceeds despite the Trustee's continued efforts. The court has found that, although the sale documents were ambiguous, the parties to the negotiation intended to convey the CD. The court has also concluded that Ms. Chastain was mistaken about whether the CD had been sold. The court must now consider whether that mistake coupled with complete inaction on the part of the Plaintiff to assert ownership or even to correct the mistake prevents the Plaintiff from claiming all or part of proceeds of the CD.

In the Sixth Circuit, the elements of the defense of equitable estoppel are as follows:

(1) conduct or language amounting to a misrepresentation of material facts; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted upon or act in such a way that the party asserting the estoppel has a right to believe it so intended; (4) the party asserting

the estoppel must be unaware of the true facts; and (5) the party asserting the
estoppel must detrimentally and justifiably rely on the representation.

*Todd's Disc. Drugs, Inc. v. United States*, No 02-1075–T, 2004 WL 838090, at *3 (W.D. Tenn.
Jan 8, 2004).

In their closing arguments, the parties raised the issue of whether the court should use the

federal or Tennessee standard when evaluating the Trustee's estoppel defense. In Tennessee, the

elements of equitable estoppel with respect to the party against whom estoppel is asserted are:

> (1) Conduct which amounts to a false representation or concealment of material
> facts, or, at least, which is calculated to convey the impression that the facts are
> otherwise than, and inconsistent with, those which the party subsequently attempts
> to assert; (2) Intention, or at least expectation that such conduct shall be acted upon
> by the other party; [and] (3) Knowledge, actual or constructive[,] of the real facts.

*Nat'l Healthcare Corp. v. Barker*, No. 3:14-cv-02015, 2016 WL 3232725, at *5 (M.D. Tenn. June
13, 2016) (quoting *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 315-316
(Tenn. 2009)).

The elements of equitable estoppel with respect to the party asserting estoppel are:

> (1) Lack of knowledge and the means of knowledge of the truth as to the facts in
> question; (2) Reliance upon the conduct of the party estopped; and (3) Action based
> thereon of such a character as to change his position prejudicially.

*Id.* (quoting *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004)).

For purposes of the court's analysis, the standards are sufficiently similar to produce the

same result. Both Tennessee and federal law require the party asserting equitable estoppel to bear

the burden of proving each element by a preponderance of the evidence. *See Del-Nat Tire Corp.

v. A to Z Tire and Battery, Inc.*, No. 2:09-cv-02457-JPM-tmp, 2010 WL 2197818, at *4 (W.D.

Tenn. May 26, 2010) (quoting *Webb v. Bd. of Trs. of Webb Sch.*, 271 S.W.2d 6, 10 (Tenn. Ct. App.

1954)).

With respect to the first and third elements requiring a misrepresentation with the intent

that it will be acted upon, *see Todd's Disc. Drugs, Inc.*, 2004 WL 838090, at *3, the Trustee relies

primarily on the actions and statements of Ms. Chastain in assisting his effort to liquidate the CD. Although the court has found that Ms. Chastain's opinion about who owned the CD does not bear on whether or not it was actually sold, her actions in helping the Trustee liquidate the CD are relevant and material to the question of estoppel.

The court finds that Ms. Chastain represented to the Trustee that the Debtor owned the CD. The court has found that this representation was incorrect because the Plaintiff in fact owned the CD. The Plaintiff attempts to distance itself from Ms. Chastain's misrepresentation by stating that she was mistaken and that it should bear no consequences for her mistake. However, that would require the court to ignore the absolute inaction of the other officers of the Plaintiff that allowed Ms. Chastain's misrepresentation to continue uncorrected for over two years.

No officer of the Plaintiff inquired about the renewal of the CD although Mr. Jones directed Mr. Mason to do so. Despite their testimony that the Plaintiff always intended to buy all of the assets, neither Mr. Jones nor Mr. Mason ever questioned Ms. Chastain's failure to provide information about the CD to Mr. Belcher. Despite the fact that the Plaintiff's financial statements were prepared with input from the Plaintiff's management and accounting staff, no one from the Plaintiff inquired of Mr. Belcher how the CD should be treated on the Plaintiff's financial statements even though much smaller contingencies were addressed in the financial statements. Mr. Belcher testified that no one from the Plaintiff ever brought the CD to his attention. Nor did the Plaintiff ever correct its financial statements to reflect its position that it owned the CD.

All of these actions or inactions reinforced the mistake rather than corrected it. No one who was involved in negotiating the agreement discussed with Ms. Chastain, the employee who was tasked with working with the Trustee, exactly which assets had been purchased and what she should do with the CD going forward. The parties contemplated that employees of the Debtor

42

would be hired by the Plaintiff and, if they continued to assist the estate, that the Plaintiff would

be compensated for their work. Even though the Plaintiff knew that its employees might be wearing

two hats in the future and in fact facilitated the arrangement, it did nothing to ensure that the

selected employee had the information she needed. The Plaintiff allowed Ms. Chastain to remain

as its contact person with the Trustee and, over the course of time that she worked with the Trustee,

Ms. Chastain was eventually made the CFO of the Plaintiff. The court finds that Ms. Chastain was

clothed with apparent authority to speak for the Plaintiff and that, therefore, it was the Plaintiff's

intention that the Trustee could act upon her representations.

Ms. Chastain's testimony also indicated that certain officers of the Plaintiff, including Mr.

Mason and Mr. Bellusci, were aware that she was working with the Trustee, although they may

not have been specifically aware that the Trustee was working to liquidate the CD. Her testimony

was inconsistent, and she was reluctant to testify that any of her superiors were aware that she was

working with the Trustee or, more specifically, that the Trustee had asked her about the CD. The

court finds that Mr. Mason and Mr. Bellusci were aware that Ms. Chastain was working with the

Trustee. It is not necessary under the circumstances for Ms. Chastain to have told anyone else that

she was assisting the Trustee specifically in liquidating the CD in order for equitable estoppel to

apply. If Ms. Chastain failed to inform her supervisors or other officers of the Plaintiff that the

Trustee was in fact liquidating the CD, such a failure was a mistake attributable to the Plaintiff.

She was a high ranking financial officer of the Plaintiff tasked with and given the authority to work

with the Trustee, and she was acting within the scope of her employment. Other officers of the

Plaintiff knew that she was working with the Trustee, whose role was to liquidate the assets of the

estate. To the extent that Ms. Chastain misrepresented who owned the CD to the Trustee at a time

when the Plaintiff contends it owned the CD, the courts finds that the Plaintiff is responsible for

her actions. For the above stated reasons, the court finds that the first and third elements of the Trustee's equitable estoppel defense are satisfied.

With respect to the second element, knowledge of the true facts, the court has already found that it was the Plaintiff's intention to purchase the CD as part of its acquisition and that it believed that the CD belonged to it from the date of the closing. The court finds that while Ms. Chastain may have been mistaken, the other officers of the Plaintiff, including Mr. Jones and Mr. Mason, had knowledge that the Plaintiff asserted ownership of the CD.

The court is not persuaded by the Plaintiff's argument that an innocent mistake by Ms. Chastain cannot constitute a misrepresentation by the Plaintiff for the purposes of equitable estoppel. The court considers the Plaintiff's argument to go to the element of knowledge. That is, one must have knowledge of the true facts while at the same time representing them to be otherwise. However, the court's primary focus for estoppel is on the Plaintiff's actions, not solely Ms. Chastain's. At a time that Plaintiff now contends it unquestionably knew it had purchased a $325,000 CD, it was simultaneously making a representation through its employee, Ms. Chastain, that it did not. The court is not persuaded that Ms. Chastain must have personally had the intention of deceiving the Trustee in order for the Plaintiff to be estopped. *See, e.g., Gibson v. Int'l Harvester Co.*, 557 F. Supp. 1000, 1004 (W.D. Tenn. 1983) ("While there was no intention on the part of the defendant to deceive Mrs. Gibson, it did, by letter . . . . inform her that she was entitled to the benefits. The Court finds that, in accepting the three checks subsequently awarded to her, the plaintiff detrimentally relied on defendant's misstatement that she was entitled to these checks."). Moreover, the court is not persuaded that equitable estoppel in the Sixth Circuit requires a showing of bad faith or an intention to mislead. *See, e.g., Dobrowski*, 571 F.3d at 556-57 (citing *Heckler*, 467 U.S. at 59) ("Our circuit should not now impose an additional knowledge or bad faith

44

requirement-doing so only risks making the doctrine intolerably unclear."). Accordingly, the court finds that the Trustee has satisfied the second element of the defense.

The last two elements apply to the Trustee. The Trustee testified that he was unaware of the Plaintiff's assertion of its ownership interest until September 2017. The Plaintiff argues that the Trustee should have read the agreement and seen the catch-all provision. The court acknowledges that equitable estoppel does not apply "where both parties have the opportunity and means of ascertaining the truth." *Nat'l Healthcare Corp.*, 2016 WL 3232725, at *5 (quoting *Escue v. Lux Time Div. of Robertshaw Controls*, 472 S.W.2d 228, 229 (Tenn. 1971)). Given the ambiguity in the documents and the unfinished exhibits discussed herein, the court does not find that simply looking at the documents would have answered the question of ownership. The Trustee inquired with Ms. Chastain, who was described to him as the person with the most knowledge of the transaction. She was a high ranking financial officer of both the buyer and the seller. Under the circumstances, the court finds that the Trustee made a reasonable level of inquiry. The court will not impose an obligation on a trustee to ask every officer who participated in sale negotiations to confirm that the designated representative is correct. The court finds that the Trustee has met the fourth element of his estoppel defense.

The fourth and final element of the defense is justifiable and detrimental reliance on the misrepresentation. *See Todd's Disc. Drugs*, 2004 WL 838090, at *3. For the reasons discussed above, the court finds that the Trustee was justified in relying on the representations of Ms. Chastain regarding ownership of the CD. Detrimental reliance or harm in the context of equitable estoppel requires that the Trustee demonstrate that he altered his position for the worse or "suffered a loss of substantial character" due to the Plaintiff's misrepresentation. *See Del-Nat Tire Corp.*, 2010 WL 2197818, at * 4 (quoting *Allen v. Neal*, 396 S.W.2d 344, 345 (Tenn. 1965)).

45

The Trustee first argues that his harm is the loss of the asset for the benefit of the estate. The Plaintiff counters that the Trustee has suffered no harm because he was never entitled to sell the CD. In other words, the estate has not lost what never belonged to it to begin with. The court does not agree with the Trustee's position that the loss of an additional dividend to unsecured creditors constitutes damage. The creditors were to receive the proceeds of the sale less administrative expenses if any proceeds remained. [Tr. Ex. 5]. They are not entitled to proceeds of the remaining CD, which the court has determined was sold, any more than they are entitled to the proceeds of the accounts receivable, equipment or inventory that were also sold.

The court fails to see any detrimental reliance with respect to the remaining CD balance of approximately $150,000 or the $75,000 liquidation that occurred in October 2017, other than the Trustee's expenses in maintaining the CD and obtaining the $75,000 reduction. In *Heckler*, the Supreme Court discussed detrimental reliance as it pertains to equitable estoppel. In that case, a health care provider had received Medicare reimbursements after a government representative had informed the health care provider on many occasions that the reimbursements were proper under applicable regulations. The government representative was mistaken, however, and the government sought repayment of the funds. The health care provider argued that the government was estopped from seeking repayment because the provider had detrimentally relied on the government's representations. The Supreme Court observed that the health care provider's

> detriment is the inability to retain money that it should never have received in the first place. Thus, this is not a case in which the respondent has lost any legal right, either vested or contingent, or suffered any adverse change in its status. When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position. Here respondent lost no rights but merely was induced to do something which could be corrected at a later time.

*Heckler*, 467 U.S. at 61–62 (internal footnotes omitted).

46

The court finds this logic instructive in this case. The parties' failure to assign the CD can be corrected, at least partially, and the court finds that the Trustee should be required to turn over the remaining CD to the Plaintiff. The Trustee will be ordered to assign his interest in the CD to the Plaintiff in accordance with the parties' agreement. The CD should be transferred subject to the claims of the State of Tennessee because the Plaintiff's testimony consistently reflected that the asset it purchased was the CD after the state's lien had been satisfied.[13] The court does not find any inequity in such a holding due to the testimony of Mr. Mason that he always believed that the CD's value would be reduced by any workers' compensation claims and would not be available until the run off period expired in July 2021.

With respect to the $75,000 received by the Trustee in October 2017, those funds remain in the estate. Those funds can be turned over to the Plaintiff as the Trustee's assertion of control over those funds is an action that can be corrected.

The most difficult issue for the court is the initial $101,300 reduction that was placed in the estate. Ownership of these funds was considered by the Trustee when he decided to make an interim distribution. The Trustee testified that he would not have made the distribution but for his belief that the estate would ultimately be the beneficiary of the CD. Now, the Trustee has remaining administrative expenses and potential, albeit unlikely, exposure for the workers' compensation claims should they exceed $150,000. The court credits the Trustee's testimony that he would not have disbursed funds from the CD to creditors if the Plaintiff had claimed ownership of the CD. The court finds that, in making the initial distribution, the Trustee relied on the misrepresentation made by the Plaintiff's employee that the CD was the Debtor's and, to the extent that he relied on the estate's ownership of the CD to make decisions about the administration of the estate, he

---

13 Although the sale was to be free and clear of liens, the Trustee noted at trial that the state was not provided with notice that its collateral was being sold free and clear of liens.

detrimentally relied on the misrepresentation and has put the successful closure of the estate at risk. The court finds that with respect to the $101,300 received prior to the interim distribution, the Trustee has met the elements of equitable estoppel and the Plaintiff is not entitled to those funds.

The Trustee has also expended time and incurred expenses pursuing the reduction of the CD. The Plaintiff has indicated that it will reimburse the Trustee for this amount, and the court finds that such a result is appropriate under the theory that the Trustee would not have undertaken these expenses but for the Plaintiff's misrepresentation. However, the court will limit the Trustee's recovery of time and expenses to those incurred pursuing the second reduction of $75,000 and those incurred administering and attempting to liquidate the remaining CD up to the date the Plaintiff objected to the Trustee's motion to sell the CD. Because the court has found that the Trustee is entitled to retain the $101,300 initial reduction, the estate has received the benefit of the Trustee's time and expenses in obtaining this reduction. Conversely, because the court is ordering the Trustee to return the $75,000 second reduction, the estate is not receiving the benefit of those funds, and the court finds that it is proper for the Trustee to be reimbursed by the Plaintiff for his time and expenses pursuing the second reduction and his efforts to maintain and further liquidate the remaining balance of the CD.

At trial, the parties did not put on sufficient evidence from which the court could determine the amount of Trustee time and expenses for the second reduction. The Trustee indicated that his total Trustee time between November 2014 and June 2017 was $22,370. [Tr. Ex. 27]. The Trustee indicated that his time and expenses incurred liquidating the CD would be less than that amount [Testimony of Richard Jahn, at 11:36:00], and the court would further reduce the recoverable amount by the time and expenses attributable only to the second CD reduction of $75,000 and

subsequent maintenance and liquidation efforts made by the Trustee up to the point that the Plaintiff objected to the sale. Accordingly, the court will require additional proof to finalize the amount of Trustee time and expenses. The court will require the Trustee to file within seven days an affidavit setting forth the time and expenses he incurred administering or liquidating the remaining CD between October 17, 2016, and September 21, 2017. The Plaintiff will have seven days in which it may file any objection to the Trustee's affidavit.

Finally, an issue was raised at trial with respect to whether the Trustee's legal expenses to defend this suit should be paid by the Plaintiff if the Trustee's equitable defenses were ultimately successful. The Trustee testified that his legal expenses to defend this suit had been approximately $30,000 but that more fees had been or would be incurred. [*Id.* at 11:25:39]. The court can take judicial notice of the four applications for interim fees and reimbursement of expenses filed by the Trustee's attorney in this litigation. Three of the applications have been approved by the court and paid by the Trustee, totaling $29,514.73. [Doc. Nos. 281, 298, 304]. As for the fourth application, requesting fees and expenses of $22,426.31, the court approved the amount but ordered that the Trustee not disburse the funds pending resolution of this adversary proceeding. [Doc. No. 320]. The court finds that the Trustee's attorney's fees and expenses incurred in defending this case are not attributable to the Plaintiff's misrepresentation under the theory of equitable estoppel. There was no reliance on a misrepresentation in the Trustee's decision to defend this litigation rather than turn over the funds. At the point that the Trustee retained counsel in this matter in November 2017, the Plaintiff had asserted ownership of the CD and its proceeds thus any misrepresentation was no longer ongoing. The Trustee evidently made a business judgment that the potential benefit to the estate of defending the litigation was greater than the potential harm. The court will, therefore, not require any additional reduction in the proceeds to be turned over to the Plaintiff.

Nothing in this decision alters the court's previous determination that the Trustee's attorney's fourth application for fees and expenses has been approved. The court will provide by separate order that the Trustee may disburse the funds of $22,426.31 that were approved by the court to his attorney once the court's trial memorandum becomes a final order.

## V.    Conclusion

The court finds that the Debtor and the Plaintiff intended to convey the CD subject to the State of Tennessee's lien under the terms of the agreement. The court, therefore, finds that the Trustee should be ordered to turn over the estate's interest in the CD to the Plaintiff. However, post-sale actions taken by the Plaintiff and its employees prevent the Plaintiff from entitlement to the full amount of the CD at the time of conveyance. Based on the doctrine of equitable estoppel, the Plaintiff's recovery will be reduced by the amount of proceeds that the Trustee obtained from the CD and relied on to make a distribution to creditors before the Plaintiff asserted an interest in the CD on September 21, 2017. The court finds this amount to be $101,300. The court will order the Trustee to assign the CD in its current form and still subject to any existing lien of the State of Tennessee for workers' compensation claims. The court will also order that the Trustee be permitted to recover any time and expenses he incurred administering or liquidating the remaining CD between October 17, 2016, and September 21, 2017. The Trustee will be ordered to file an affidavit setting forth such time and expenses within seven days of entry of this memorandum, and the Plaintiff shall have seven days in which to file any objection. Upon a determination of that reimbursement amount, the Trustee shall be required pay to the Plaintiff the net amount of $75,000 less the allowed reimbursement amount. The Plaintiff will not be required to reimburse the Trustee for his attorney's time and expenses in defending this adversary proceeding. The court will order that the Trustee may disburse funds that were approved by the court in the amount of $22,426.31

to his attorney.

A separate order will enter.

# # #